UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
www.flsb.uscourts.gov

In re                                                                                  CASE NO. 14-31149-BKC-JKO
                                                                                       CHAPTER 7
JUAN MARCOS MATOS RUIZ, *et al*.                      (Substantively Consolidated)

     Debtor.
_____/

KENNETH A. WELT, not individually                         ADV. NO.
but as Chapter 7 trustee,

     Plaintiff,

v.

WELLS FARGO ADVISORS, LLC, a
Delaware corporation, as successor
to Wachovia Securities, LLC

     Defendant.
_____/

**ADVERSARY COMPLAINT TO AVOID AND RECOVER
FRAUDULENT TRANSFERS AND DEMAND FOR JURY TRIAL**

     The Plaintiff, KENNETH A. WELT (the "Trustee" or "Plaintiff"), not individually but as Chapter 7 Trustee of the bankruptcy estate of the above-captioned substantively consolidated Debtors, files this Adversary Complaint to Avoid and Recover Fraudulent Transfers and Demand for Jury Trial, against the Defendant, WELLS FARGO ADVISORS, LLC, as successor to Wachovia Securities, LLC (the "Defendant"), and alleges:

**THE PARTIES, JURISDICTION AND VENUE**

     1.    On September 22, 2014 ("Petition Date"), Juan Marcos Matos Ruiz ("Matos") filed a voluntary petition for relief under Chapter 7, title 11 of the United States Code with this Court. [ECF No. 1].

2. By Order dated August 5, 2015, the Court substantively consolidated Blue Top Holdings, Corp.("Blue Top"), a Florida for profit corporation; Sargus Management, LLC ("Sargus Management"), a Florida for profit limited liability company; Salute Wines, Inc. ("Salute Wine"), a Florida for profit corporation; Ohio Private Lending, LLC ("Ohio Private Lending"), a Florida for profit limited liability company; and Coal Capital, LLC ("Coal Capital"), a Florida for profit limited liability company (Bue Top, Sargus Management, Ohio Private Lending, Salute Wine and Coal Capital are sometimes collectively referred to herein as the "Corporate Debtors"), with the Ruiz's bankruptcy estate *nunc pro tunc* to the Petition Date. [ECF No. 111].

3. The Trustee is the duly appointed and acting Chapter 7 trustee for the substantively consolidated bankruptcy estates of the above-captioned debtors.

4. The Defendant is a Delaware limited liability company authorized to operate within the State of Florida, with the following mailing, business, and/or registered agent addresses:

> Wells Fargo Advisors, LLC
> One North Jefferson Avenue
> St. Louis, MO  63103
>
> Wells Fargo Advisors, LLC
> c/o Corporation Service Company
> Registered Agent
> 1201 Hays Street
> Tallahassee, FL  32301-2525

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

6. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), and the Trustee consents to the entry of final orders and judgment by the Bankruptcy Court.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8. All conditions precedent to filing this Complaint have occurred, been satisfied and/or performed by the Plaintiff, or have been waived and/or otherwise been excused.

## FACTS COMMON TO ALL CLAIMS

### A. Nature of Action

9. In this action, the Trustee seeks to avoid and recover certain avoidable transfers in the form of deposits made by one or more of the Debtors to the Defendant as part of an ongoing fraudulent scheme by Matos and the Corporate Debtors done with actual intent to hinder, delay, or defraud creditors, with Defendant having received such transfers on "inquiry notice" of the avoidable nature of the transfers, thereby depriving it of any potential "good faith" defense.

10. As alleged herein, at all times material hereto the Debtors, by and through their directors and officers (the "D&Os"), were engaged in various fraudulent schemes, including an Investment Scheme (as further defined herein below), an Illegal Currency Exchange scheme (as further defined herein below) transactions, and otherwise breached their fiduciary duties owed to the Corporate Debtors.

11. To this end, the accounts maintained by Matos and the Corporate Debtors at the Defendant ("WFA Accounts") were used as the platform to conduct the Investment Scheme, and the Illegal Currency Exchange and Race Horse Trade transactions were integral to such ponzi-like fraudulent activities.

### B. The Fraudulent Scheme

12. Prior to the Petition Date, Matos held himself out as engaging in the business of providing purported advisory and consulting services for private clients residing in the United States and overseas, particularly in Venezuela, through one or more of the Corporate Debtors.

13. The management "team" for the business was supposedly comprised of: (1) Matos, as the General Director for the business; (2) Ivone Heredia and Pat Zuniga as the head of the real estate residential brokerage division; (3) Vicente Lombardi as the one in charge of real estate development; (4) Gisel Margez and Leon Alvarez as the head of the business consultant division; and (5) Jose Capobianco as the lending consultant, through Ohio Private Lending. However, each member of the so-called management team was merely acting as independent contractors with no other affiliation to the Corporate Debtors (except for Mr. Capobianco who operated Ohio Private Lending).

14. Matos, through the Corporate Debtors, would purport to act as the personal manager of investments for clients. In this regard, the Corporate Debtors offered a wide range of services, including, but not limited to, investing funds in the stock markets, providing the investors with opportunities for distressed real estate property, listing and selling of new and resale homes and condominiums in South Florida, managing real estate property for a monthly management fee, providing general financial advisory services and other financial advice and consulting services to clients, including for business planning, and management of startup businesses to be located in South Florida.

15. Notably, at all times applicable herein, neither Matos nor any of the Corporate Debtors were licensed or qualified to act as a real estate broker, financial advisor, or financial advisor firm with the Florida Department of Business and Professional Regulation, Florida Department of Financial Services, or any other agency regulating such financial activities within the State of Florida.

16. Matos, through one or more of the Corporate Debtors, preyed on clients to invest in the stock markets, promising high returns between 9-12% on their investment. Based on such

promises, investors would send money to Blue Top or Sargus Management to invest in the stock markets. Investments, however, were made by Blue Top in its own name. Neither Matos nor any of the Corporate Debtors would segregate accounts for investors, send notifications or confirmations of any stock trades or investments supposedly made on behalf of investors, or send investors account statements of their alleged investments in the stock markets.

17. Subsequently, in 2010, Matos, through one or more of the Corporate Debtors, began luring investors to diversify their alleged stock portfolios into the distressed real estate market in South Florida because investments in real property were more lucrative and a safer bet given the volatility of the stock markets and downward spiral turn of the real estate markets at that time. In so doing, the so-called management team would present the investors with real estate investment opportunities. The bait worked. Investors would not only attempt to shift their stock investments to these alleged opportunities, but, more often than not, additional funds would be sent to Blue Top or Sargus Management to ultimately transfer such funds to Ohio Private Lending to invest such proceeds in the distressed real estate opportunities.

18. In continuing to perpetuate the above scheme, Matos, through one or more of the Corporate Debtors, would request investors to send money to Blue Top or Sargus Management to supposedly pay for closing costs, condominium association fees, and other related to costs associated with the ownership of real property bought for or on behalf of investors. However, in actuality, the real estate properties were never acquired in the name of the investors or later placed in their names as agreed with such investors. Rather, the properties would remain in the name of Matos or one or more of the Corporate Debtors.

19. Matos used the above scheme to support his gambling vice, provide for his family and living expenses, and support his life style (the "Investment Scheme"). To keep the

Investment Scheme going, Matos interchangeably used personal funds, family funds, and corporate funds from the Corporate Debtors to pay, at his caprice, the investors their fictitious return on investment or principal amount of the investments.

20. Millions of dollars were churned and lost to highly speculative security investments, in an attempt to breath continued life to the Investment Scheme. Investors were not informed of such speculative investments. Stock market investments were done on margin and the majority were placed on daily trades in highly speculative exchange-traded funds ("ETF"). ETFs are marketable securities traded on stock exchanges, and hold assets such as stocks, commodities, or bonds. Most ETFs track an index, such as a stock index or bond index. ETFs experience price fluctuations throughout the day as they are bought and sold. While ETFs typically have higher daily liquidity and lower fees than mutual fund shares, making them an attractive alternative for individual investors, they are as volatile as the markets the ETFs are invested and valued. Matos mostly invested funds in leveraged ETFs, which are designed to magnify the returns of the index or benchmark they track, and inverse ETFs, which may allow investors to profit from a decline in the underlying index or benchmark.

21. Such type of ETFs are specifically designed to meet performance objectives on a daily basis only, and the returns on leveraged and inverse ETFs may differ significantly from the underlying benchmark over longer periods of time. Matos did not have the experience, technical knowhow, or training to invest in these type of speculative vehicles, or count with the assistance of any financial professional or advisor within the Defendant to assist him with the decision-making process to adequately invest in these kind of complex investments or explain the substantial higher risks these investment vehicles carry to impart the same information or knowledge onto the investors.

22. In addition to the above Ponzi-like scheme, Matos, at his Rule 2004 examination, admitted to have engaged in the illegal exchange of Venezuelan currency into U.S. dollars directly or through one or more of the Corporate Debtors – more recently with Coal Capital together with its similarly named Venezuelan counterpart, Coal Capital LLC CA, a Venezuelan corporation, months prior to and after the filing of his bankruptcy petition (the "Illegal Currency Exchange").

23. Notably, since 2003, Venezuela has had a strict foreign currency exchange control that prohibits the Illegal Currency Exchange. Individuals and legal business entities can only the Defendant and sell foreign currency exclusively through the Central Bank of Venezuela ("BCV") – the country's central bank – and traders specifically authorized by law. In Venezuela, the "Ley Contra los Ilicitos Cambiarios" or, as translated into English, the Law against Illegal Foreign Currency Exchanges ("LIC"), penalizes foreign currency exchange transactions (i.e., the bank/sale of foreign currency with the Venezuelan bolivar) that circumvent the mechanisms established by law.

24. If one violates the LIC, the law provides severe sanctions, including (i) the imposition of fines up to double the amount of the foreign exchange currency transaction at issue, and/or (ii) charging the infringer with the crime of illegally exchanging foreign currency through fraud, falsehoods, or through any other fraudulent means in an attempt to avoid the foreign exchange controls in place which carries prison terms of 3 to 7 years.

25. Also, Matos, through Blue Top, acquired racing horses through a fictitious, non-existent subsidiary by the name of "Blue Tops Stables." In his Rule 2004 examination, Matos testified that he would buy, breed, house and sell race horses at auctions or reclaim races (horse race placing value of a horse depending on its performance) ("Race Horse Trading"). This

speculative activity was funded with investors' moneys through Blue Top, and not through any other independent sources, including Matos' own personal funds. Blue Top did not benefit or profit from the Race Horse Trading, and every dollar put into this activity was lost. Matos did not count with any experience trading with or investing in racing horses for a profit. His only experience was actually gambling in horse races in known venues across South Florida, such as Calder Casino & Race Course and the like.

26. To date, the Trustee has come to learn of at least 12 victims (a/k/a defrauded creditors) of the Investment Scheme who, based upon the results of the investigation conducted to date, are collectively believed to be owed millions of dollars.

C. **The Banking Transactions and Other Damages at Issue**

27. To carry out the above-referenced Investment Scheme, Illegal Currency Exchange scheme, and Race Horse Trading scheme, Matos and/or one or more of the Corporate Entities used several accounts at various financial institutions, including the Defendant.

28. From February 2008 to October 2011, the Corporate Debtors had opened and maintained accounts at with the Defendant.

29. Between September 2010 and October 2011, the D&Os caused the Corporate Debtors to deposit in excess of $1,600,000 into accounts maintained by the Defendants.

30. Following each deposit, the D&Os would engage in speculative and risky stock trades on "margin."

31. The Corporate Debtors made transfers/banking transactions into and out of the accounts maintained by the Defendant as detailed and set forth in the attached **Exhibit 1** (collectively, the "Transfers").

32. Following the receipt of funds from investors and depositing such funds with the Defendant, the Corporate Debtors and the D&Os embezzled, converted, and absconded with the

funds for their own personal use, paying little or nothing to the investors as purported returns on their fictitious investments.

33. At all or certain times material hereto, Defendant failed or otherwise willfully ignored to follow sound practices and procedures, including applicable anti-money laundering and "know your customer" rules and regulations, and therefore knew of questionable activities and transactions being conducted in the accounts of the Corporate Debtors maintained at and with the Defendant.

34. The foregoing acts and omissions of the Defendant included, but may not necessarily be limited to: (i) when the accounts were opened, the Defendant failed to confirm whether the D&Os or the Corporate Debtors were licensed brokers; (ii) the Defendant failed to fully or properly employ "know your customer" or anti-money laundering protocols given which, had they been employed, would have resulted in the Defendant either never opening the accounts or requiring them to be closed soon after they were opened; and (iii) the Defendant permitted risky trading to occur, which raised serious red flags about the bona fides of the Corporate Debtors' business and financial affairs.

35. Thus, Defendant's "knowledge" of the bad faith schemes was self-evident from its own internal documents and records, including the accounts it maintained for and on behalf of the Corporate Debtors, along with various reports maintained by Defendant as required by applicable law and sound know your customer, anti-money laundering practices, including money laundering reports and large dollar transaction reports.

**D.     Counsel for the Plaintiff**

36. The Plaintiff has retained the undersigned law firms to represent him in this action and is obligated to pay them reasonable attorneys' fees and costs for their services.

## ACTION TO AVOID AND
## RECOVER FRAUDULENT TRANSFERS

The Plaintiff sues the Defendant and alleges:

37. The Plaintiff re-alleges Paragraphs 1 through 36 above.

38. This is an action against the Defendant for the avoidance and recovery of fraudulent transfers pursuant to Sections 544, 548, and 550 of the Bankruptcy Code, and Chapter 726 of the Florida Statutes.

39. Within four years of the date of the filing of this action, the Corporate Debtors made the Transfers to the Defendant.

40. At all times material hereto, each of the Corporate Debtors were present and future creditors of one another, as a result of certain inter-company transfers and the liabilities each owed to the other as a direct consequence of the ongoing Investment Scheme.

41. The Plaintiff, as the duly appointed representative of each of the Corporate Debtors, has standing to pursue claims against third parties to avoid and recover fraudulent transfers, which claims may be asserted against the actual recipients of the transfers and bad faith commercial conduits, such as the Defendant, that are deemed to have acted in bad faith in processing banking transactions for and/or on behalf of the Corporate Debtors.

42. The Transfers were made by the Corporate Debtors with the actual intent to hinder, delay, or defraud creditors of the Corporate Debtors, in that such transfers were made in furtherance of the Investment Scheme, Illegal Currency Exchange scheme, and Race Horse Trading scheme. In addition, multiple badges of fraud existed at the time of each of the transfers, including that the Corporate Debtors: (i) were insolvent when the transfers were made; (ii) could not pay their debts as they became due; and (iii) were involved in multiple fraudulent and/or illegal schemes, including the Investment Scheme, Illegal Currency Exchange scheme,

and Race Horse Trading scheme.

43. At all times material hereto, there were creditors that could have avoided the Transfers, including certain of the victims of the Investment Scheme, Illegal Currency Exchange scheme, and Race Horse Trading scheme/transactions and/or the affiliates of the Corporate Debtors, which were creditors of one another as a result of certain inter-company transfers and transactions between and/or among them.

44. For the reasons described above (and others as may be revealed through discovery), at the time of certain and/or all of the Transfers, the Defendant was not acting as a good faith "conduit" of the funds transferred by the Corporate Debtors into and out of the accounts, and therefore cannot avail itself of the "good faith" defense permitted by law. a

WHEREFORE, the Plaintiff demands judgment against the Defendant: (i) for the avoidance and recovery of the Transfers received by the Defendant in the form of deposits and/or withdrawals during the four years preceding the Petition Date; (ii) for an award of damages in the amount of the Transfers; (iii) for an award of pre- and post-judgment interest; (iv) for an award of costs; and (v) for any other relief the Court deems appropriate.

## **RESERVATION OF RIGHTS**

The Plaintiff reserves the right to seek leave to supplement or amend the current factual allegations and claims, and/or to add additional parties, following the commencement or completion of discovery.

Dated this 20th day of January, 2017.

          GENOVESE JOBLOVE & BATTISTA, P.A.
          *Attorneys for Kenneth Welt, Chapter 7 Trustee*
          David C. Cimo, Esq.
          Fla. Bar No. 775400
          100 S.E. 2nd Street, 44th Floor
          Miami, FL  33131
          Tel. (305) 349-2300
          Fax. (305) 349-2310
          Email: dcimo@gjb-law.com

          By:   /s/ David C. Cimo
              David C. Cimo, Esq.
              Fla. Bar. No. 775400

# EXHIBIT 1

In re: Juan Marcos Matos Ruiz
Case No: 14-31149-JKO
Petition Date: 9/22/2014

Summary of Monthly Cash Activity for Blue Top Holdings Wells Fargo No. 2648 for the Period September 2010 through October 2011

### Cash Activity Summary

| Beg. Bal Date | Beginning Balance | Securities Purchased - Margin Account | Securities Sold - Margin Account | Funds Deposited | Funds Disbursed | Payee | Income | Expense - Margin Interest Charged | Other | Closing Balance | Closing Bal Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/10 | $ (363,487.40) | $ (1,477,828.38) | $ 2,019,016.48 | $ 560,000.00 | | | | $ (303.31) | $ - | $ 677,397.39 | 09/30/10 |
| 10/01/10 | 677,397.39 | (1,711,144.26) | 1,165,080.60 | | (40,000.00) | Wire to Bank of America | | (67.46) | (25.00) | 91,241.27 | 10/31/10 |
| 11/01/10 | 91,241.27 | (2,455,709.06) | 3,032,952.05 | 750,000.00 | (138,000.00) | ACH D/D & Wire to Wachovia | | (24.80) | | 1,280,459.46 | 11/30/10 |
| 12/01/10 | 1,280,459.46 | (2,189,080.74) | 437,651.04 | | (25,000.00) | ACH D/D FBO BTH | | (675.26) | | (496,645.50) | 12/31/10 |
| 01/01/11 | (496,645.50) | (365,070.40) | 480,685.49 | 105,000.00 | | | | (752.58) | | (276,791.99) | 01/31/11 |
| 02/01/11 | (276,791.99) | (198,514.61) | 715,220.18 | | (298,788.15) | Wires to Northern Trust & Citibank | | (380.27) | (50.00) | (59,304.84) | 02/28/11 |
| 03/01/11 | (59,304.84) | (1,716,424.87) | 1,386,873.50 | 275,000.00 | (75,000.00) | ACH D/D | | (266.27) | | (189,172.48) | 03/31/11 |
| 04/01/11 | (189,172.48) | (1,352,990.93) | 852,260.08 | | (25,000.00) | Wire to Wachovia | | (540.76) | | (715,444.07) | 04/30/11 |
| 05/01/11 | (715,444.07) | (1,033,965.79) | 1,050,627.46 | | | | | (993.89) | | (701,716.29) | 05/31/11 |
| 06/01/11 | (701,716.29) | (1,737,304.54) | 2,357,038.13 | | (545,000.00) | ACH D/D & Wire to Mercantil Commerce Bank | | (2,227.84) | (25.00) | (629,235.54) | 06/30/11 |
| 07/01/11 | (629,235.54) | (267,955.30) | 413,095.61 | | (60,000.00) | Wire to Wachovia | | (1,541.28) | | (545,636.51) | 07/31/11 |
| 08/01/11 | (545,636.51) | (195,705.26) | 807,248.65 | | (76,000.00) | ACH D/D by Juan Matos Ck x0345 | | (696.33) | | (10,789.35) | 08/31/11 |
| 09/01/11 | (10,789.35) | - | 15,599.95 | 5,000.00 | (49,000.00) | ACH D/D by Juan Matos Ck x0345 | | (114.12) | | (59,303.52) | 09/30/11 |
| 10/01/11 | (59,303.52) | - | - | 39,438.54 | - | | | (36.39) | (98.63) | (0.00) | 10/31/11 |
| | | | | | | | | | | | |
| | $ | $ (14,703,641.12) | $ 14,733,299.22 | $ 1,634,438.54 | $ (1,331,788.15) | | $ - | $ (8,620.46) | $ (198.63) | | |

Source:
Wells Fargo Advisors statements for Blue Top Holdings account no. 2648 for the period of September 1, 2010 through October 31, 2011

### Portfolio Summary

| | A | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cash/(Margin Loan) | Insrd Dep Acct | Money Market | Short Balance | Stocks | Short Stocks | Fixed Income | Options | Short Options | Mutual Funds | Other | Total |
| $ 677,397.39 | | | | $ 1,322,625.00 | | | | | | | $ 2,000,022.39 |
| 91,241.27 | | | | 1,798,210.00 | | | | | | | 1,889,451.27 |
| 1,280,459.46 | | | | 1,103,647.40 | | | | | | | 2,384,106.86 |
| (496,645.50) | | | | 2,640,525.00 | | | | | | | 2,143,879.50 |
| (276,791.99) | | | | 2,462,450.00 | | | | | | | 2,185,658.01 |
| (59,304.84) | | | | 1,834,300.00 | | | | | | | 1,774,995.16 |
| (189,172.48) | | | | 2,169,165.00 | | | | | | | 1,979,992.52 |
| (715,444.07) | | | | 2,739,871.00 | | | | | | | 2,024,426.93 |
| (701,716.29) | | | | 2,673,163.00 | | | | | | | 1,971,446.71 |
| (629,235.54) | | | | 1,578,546.00 | | | | | | | 949,310.46 |
| (545,636.51) | | | | 1,372,946.00 | | | | | | | 827,309.49 |
| (10,789.35) | | | | 552,000.00 | | | | | | | 541,210.65 |
| (59,303.52) | | | | 501,375.00 | | | | | | | 462,071.48 |
| - | | | | - | | | | | | | |